IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| RBC BANK, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )     CASE NO. 2:09-CV-169-WKW [WO] |
| | ) |
| CMI ELECTRONICS, INC., *et al.*, | ) |
| | ) |
| Defendants, | ) |
| | ) |
| v. | ) |
| | ) |
| TODAY'S DESIGN & | ) |
| MANUFACTURING, INC., *et al.*, | ) |
| | ) |
| Third-Party Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

This case began when Plaintiff RBC Bank sued Defendant Rondal J. Kindrick to collect on a note Kindrick purportedly had guaranteed when he was president of Defendant CMI Electronics, Inc.[1]  (Doc. # 1.)  Then, Mr. Kindrick filed cross-claims against CMI and sued the Third-Party Defendants, CMI's successor entities, alleging that those who took control of CMI had assumed all his liabilities with respect to the note.  (Doc. # 9.)  Finally, the Third-Party Defendants filed counterclaims against Mr. Kindrick, asserting that he had made various fraudulent misrepresentations as to the state of CMI's finances when he sold his interest in it.  (Doc. # 19.)  Before the court are two motions for summary judgment, one

---

[1] CMI is currently in bankruptcy proceedings, and thus its involvement in this litigation has been stayed pursuant to 11 U.S.C. § 362(a).  (Docs. # 40, 45.)

filed by RBC in support of its claims (Doc. # 47), and one filed by Mr. Kindrick opposing the counterclaims of the Third-Party Defendants.  (Doc. # 56.)  No dispositive motions have been filed with respect to Mr. Kindrick's claims against the Third-Party Defendants.

## I.  JURISDICTION AND VENUE

The court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1332. The parties do not contest personal jurisdiction or venue, and the court finds adequate allegations in support of each.

## II.  STANDARD OF REVIEW

Summary judgment is appropriate if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *see Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007).  The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record, including pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant may meet this burden by presenting evidence indicating there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Id.* at 322-24.

If the movant meets its evidentiary burden, the burden shifts to the nonmoving party to establish, with evidence beyond the pleadings, that a genuine issue material to each of its claims for relief exists.  Fed. R. Civ. P. 56(e)(2) ("When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must . . . set out specific facts showing a genuine issue for trial."); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Celotex*, 477 U.S. at 324.  What is material is determined by the substantive law applicable to the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248; *see also Lofton v. Sec'y of the Dep't of Children & Family Servs.*, 358 F.3d 804, 809 (11th Cir. 2004) ("Only factual disputes that are material under the substantive law governing the case will preclude entry of summary judgment.").  Furthermore, "[t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case."  *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003) (internal quotation marks and citation omitted).

A genuine issue of material fact exists when the nonmoving party produces evidence that would allow a reasonable fact-finder to return a verdict in its favor.  *Greenberg*, 498 F.3d at 1263; *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001).  If the evidence on which the nonmoving party relies, however, "is merely colorable, or is not significantly probative, summary judgment may be granted."  *Anderson*, 477 U.S. at 249-50 (citations omitted).  "A mere 'scintilla' of evidence supporting the [nonmovant's] position

will not suffice; there must be enough of a showing that the [trier of fact] could reasonably find for that party," *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citation omitted), and the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Hence, when a plaintiff fails to set forth specific facts supported by appropriate evidence sufficient to establish the existence of an element essential to his case and on which the plaintiff will bear the burden of proof at trial, summary judgment should be granted in favor of the defendant.  *Celotex*, 477 U.S. at 323.

Thus, in cases where the evidence is admissible on its face or can be reduced to admissible form and establishes there is no genuine issue of material fact, and where the party moving for summary judgment is entitled to it as a matter of law, summary judgment is proper.  *Celotex*, 477 U.S. at 323-24.

### III.  DISCUSSION

Because the two motions for summary judgment stem from the same general set of circumstances, but involve separate causes of action, and to some extent separate parties and facts, they will be discussed separately.

### A.  RBC's Motion for Summary Judgment

#### 1.  Guaranty Agreement Claim

RBC asserts that Mr. Kendrick is liable to it based on a June 22, 2005 promissory note and guaranty agreement signed by him.  (Doc. # 49, Attach. 1, Exs. A (promissory note) and

B (guaranty agreement).)  Under Alabama law, a "'suit on a guaranty agreement requires proof of the existence of the guaranty contract, default on the underlying contract by the debtor, and nonpayment of the amount due from the guarantor under the terms of the guaranty.'"  *Sharer v. Bend Millwork Sys., Inc.*, 600 So. 2d 223, 225-26 (Ala. 1992) (quoting *Delro Indus., Inc. v. Evans*, 514 So. 2d 976, 979 (Ala. 1987)).  In the case of a continuing guaranty, it is also necessary to prove that the guarantor received notice of the debtor's default, unless that right has been waived by the terms of the guaranty contract.  *Id*. at 226.

In addition to the promissory note and guaranty agreement, RBC submits the affidavit of Richard Ramsay, an RBC executive.  (Doc. # 49, Attach. 1.)  This affidavit states that Mr. Kindrick signed the June 22, 2005 promissory note in the amount of $250,000, on behalf of his company, CMI Electronics, Inc., to AmSouth Bank.  (Doc. # 49, Attach. 1, ¶¶ 4-5.)  The note became due June 22, 2008, or earlier if payment was demanded.  (Doc. # 49, Ex. 1, ¶ 6.)  The note was transferred in due course to RBC Bank, and has now matured under its terms. (Doc. # 49, Attach. 1, ¶¶ 10-12.)  The affidavit goes on to state that CMI defaulted on its obligations under the note, and that Mr. Kindrick, in turn, defaulted on his obligations under the guaranty agreement.  (Doc. # 49, Attach. 1, ¶¶ 13-15.)  Pursuant to the guaranty agreement's terms, Mr. Kindrick waived the right to receive notice of CMI's default on the promissory note.  (Doc. # 49, Attach. 1, ¶ 16.)  Finally, the guaranty agreement provides for the recovery of costs and expenses, including attorneys' fees, associated with collecting the sums due under the note.  (Doc. # 49, Attach. 1, ¶ 9.)

Mr. Kindrick, however, claims that RBC has failed to make out a prima facie case that would support a motion for summary judgment under Alabama law. Mr. Kindrick first objects to the fact that the promissory note submitted was, by its own terms, "executed for the purpose of continuing, modifying and amending the terms of" a December 22, 2004 promissory note in the amount of $200,000. (Doc. # 58, at 9 (quoting Doc. # 49, Attach. 1, Ex. A.) According to Mr. Kindrick, RBC cannot establish that CMI defaulted on this earlier contract, or even "that a valid contract existed," because its terms are not in the record. (Doc. # 58, at 9-10.)

The court disagrees. As to this motion, the only question concerns Mr. Kindrick's obligations as guarantor, pursuant to the guaranty agreement that he signed on June 22, 2005, with respect to the promissory note signed the same day. Moreover, the June 22, 2005 promissory note by its own terms states that it is in the amount of $250,000, and not merely for an "additional" $50,000. (*See* Doc. # 49, Attach. 1, Ex. A ("For value received, the undersigned . . . promises to pay to the order of AmSouth Bank . . . Two Hundred Fifty Thousand AND 00/100 Dollars.").) Mr. Kindrick does not point to any part of the promissory note that makes its meaning, at least as relevant here, contingent upon some hypothetical text in the December 22, 2004 promissory note. Nor is RBC, in attempting to collect on the note, relying on any now-undisclosed terms in the earlier note. Rather, it relies entirely on the language of the June 22, 2005 note, which is in the record. With respect to Mr. Kindrick's speculation that the December 22, 2004 agreement may be invalid for lack

6

of assent or consideration, the court agrees with RBC that the question is irrelevant.  Even if there were some defect in the earlier note, the June 22, 2005 promissory note would not thereby become invalid itself, absent some showing that it lacked assent or consideration. Because Mr. Kindrick offers nothing in contradiction of the Ramsay affidavit's statement that CMI defaulted on the June 22, 2005 promissory note, there is no genuine dispute of material fact on that issue.

Next, Mr. Kindrick argues that there is a dispute of fact whether the June 22, 2005 guaranty agreement guaranteed "the entire $250,000" or "only . . . the $50,000 of credit above the $200,000 extended in the 2004 agreement."   (Doc. # 58, at 10.)   This characterization of the June 22, 2005 promissory note and guaranty agreement is simply inaccurate.  First, as quoted above, the note does not state that it is an "extension" of credit only in the amount of $50,000, but rather that CMI was obligating itself for the full amount of $250,000.  Second, even if Mr. Kindrick were correct that the June 22, 2005 note was only in the amount of $50,000, RBC correctly observes that the guaranty promises that Mr. Kindrick would guarantee all debts of CMI "due or become due, now existing or hereafter incurred . . . regardless of how they arise or by what agreement or instrument they may be evidenced. . . ."  (Doc. # 59, at 3.)  The agreement is sufficiently clear to be enforced under

7

Alabama law.[2]  *See Shears v. All States Life Ins. Co.*, 5 So. 2d 808 (Ala. 1942).  There is no genuine issue of material fact as to the original amount of the guaranty.

Third, Mr. Kindrick argues that RBC has not proven the amount currently owed under the guaranty with sufficient particularity.  RBC, via the Ramsay affidavit, alleges that, as of November 11, 2009 (just before the summary judgment motion was filed), the amount owed by Mr. Kindrick was $216,827.44, with interest accruing at the rate of $47.05 per day.  (Doc. # 49, Attach. 1, ¶ 17.)  Of this amount, $204,923.79 accrued prior to the filing of this case on March 3, 2009, and $11,903.65 represents interest accrued from the filing of the suit forward to November 10, 2009.  (Doc. # 49, Attach. 1, ¶ 17.)  Mr. Kindrick correctly notes that self-serving affidavits may typically be given little weight in adjudicating a motion for summary judgment.  But when the nonmoving party, as here, presents absolutely no evidence – not even his own self-serving affidavit – contradicting the movant's plausible affidavit, there is no bar to summary judgment.  Here, the only evidence submitted by Mr. Kindrick is a letter from RBC to CMI dated February 3, 2009, stating that the amount due on the guaranty was only $202,053.00.  (Doc. # 58, Attach. 1.)  According to Mr. Kindrick, this document contradicts the Ramsay affidavit, as it fails to explain how the amount owed

---

[2] Mr. Kindrick's argument that he would not be liable for unknown extensions of credit that occurred between the first note and the second fails for the same reasons.  First, the June 22, 2005 promissory note was specifically in the amount of $250,000, and it is that amount, and not any other credit extensions, for which RBC seeks to hold Mr. Kindrick liable.  Therefore, it is not relevant that RBC "completely fails to detail how much money was extended to CMI prior to Kindrick's guaranty." (Doc. # 58 at 12.)  Second, Mr. Kindrick's selectively quoted language (which in any event is a general statement about the purpose of the agreement, rather than specific terms) ignores the broader promise to guarantee past and future debts.

increased to $216,827.44.  But the explanation is apparent from the affidavit itself, as well as from common sense and arithmetic.  From the time of the February 3 letter to the November 10 calculation, the account had been accruing interest at the rate of $47.05 per day.  Not coincidentally, $11,903.65 divided by $47.05 is 253, the number of days that elapsed between those two dates.  This is the obvious explanation for the differing amounts.  Mr. Kindrick has not raised a genuine issue of material fact as to the amount due.

Finally, Mr. Kindrick disputes the amount of attorneys' fees to which RBC is entitled. He argues that RBC has failed to identify its rates, expertise, and comparable rates for similar legal services with sufficient specificity, and that it failed to show the reasonableness of expenses it incurred.  (Doc. # 58, at 15-18.)  RBC's evidentiary basis for its legal fees is an affidavit submitted by one of its attorneys, John R. Lehman II.  (Doc. # 49, Attach. 2.)  The affidavit submits that Mr. Lehman is familiar with the fees charged by his firm, Burr & Forman, to its clients, the fees charged to RBC in connection with this litigation, and the fees customarily charged by Birmingham law firms in connection with similar litigation.  (Doc. # 49, Attach. 2, ¶ 2.)  After listing a number of activities engaged in by Burr & Forman attorneys in connection with this case, the affidavit states that $18,359.97 in fees had been accrued at the time the summary judgment motion was submitted, and that approximately $4000 in additional fees are expected to be incurred in executing a judgment if RBC prevails. (Doc. # 49, Attach. 2, ¶ 5.)  Finally, the affidavit opines that the fees and expenses accrued are reasonable.  (Doc. # 49, Attach. 2, ¶ 6.)

9

The court agrees in part with Mr. Kindrick's objections to the requested fee award, in that the Lehman affidavit contains no specifics as to rates, hours billed, or the billing arrangements that may exist between RBC and Burr & Forman. Accordingly, the court accepts RBC's offer to provide the court with appropriate billing records and invoices for *in camera* review. RBC is DIRECTED to provide the court, under seal and *in camera*, with more detailed records supporting its fee request, together with a revised final amount in fees and expenses requested, no later than ten days after the date of this opinion. Entry of judgment will be delayed pending receipt and review of such documents.

In all other respects, RBC's motion for summary judgment is well taken, and is due to be granted.

*2. Rule 56(f) Motion*

Mr. Kindrick contends that RBC's motion for summary judgment was premature, because he was unable to adequately respond to it based on the state of discovery as of the time of the motion. He asserts that his counsel has been "unable to review pertinent documents" that could affect the amount owed by Mr. Kindrick. (Doc. # 58, at 18.) Offered in support is the affidavit of Mr. Kindrick's counsel, Scott Speagle. (Doc. # 58, Ex. 2.) Primarily, the motion and affidavit cite documents that would come from CMI in response to discovery requests. (Doc. # 58, Ex. 2, at 2-3.) According to the affidavit, these documents would allow Mr. Kindrick to ascertain the "actual balance" on the note, and whether "any

activity on the part of CMI or RBC [had made] voidable Kindrick's guaranty." (Doc. # 58, Ex. 2, at 3.)

The court agrees with RBC that the grounds cited for the Rule 56(f) motion are too vague and speculative for the motion to be meritorious. *See Bevan v. Durling*, 243 F. App'x 458, 463 (11th Cir. 2007). Further, the court notes that, according to the affidavit, all the relevant information was to be received by counsel the week of December 7, 2009. In the seven months that have elapsed since that date, Mr. Kindrick has not sought to amend his summary judgment briefing with new information, nor has he complained that the discovery did not take place as scheduled. Therefore, granting the motion at this stage would in any event appear to be futile. It is due to be denied.

## B. **Kindrick's Motion for Summary Judgment**

The second pending motion for summary judgment is brought by Mr. Kindrick in an effort to dismiss claims for breach of contract, fraudulent suppression, and fraudulent misrepresentation[3] brought against him by the Third-Party Defendants. Both counts relate to the sale of Mr. Kindrick's controlling share in CMI to the Third-Party Defendants, concluded by a Stock Purchase Agreement ("SPA") signed January 8, 2008. (Doc. # 61, Ex.

---

[3] The Third-Party Complaint pleads only two claims, one for breach of contract and one for fraudulent suppression. (Doc. # 19.) In the text of the fraudulent suppression claim, however, the Third-Party Defendants alleged that Mr. Kindrick "fraudulently misrepresent[ed]" the state of CMI's relations with the banks. (Doc. # 19, ¶ 25.) Given that Mr. Kindrick has not raised the manner in which the counts were pleaded, the court will evaluate both on their merits; however, as noted below, the elements of the claims are not identical, especially as to the level of intent or knowledge required of a defendant.

5.)  The alleged breach of contract and fraud relate both to this written agreement and to alleged oral representations made by Mr. Kindrick.

The Third-Party Defendants allege that they purchased Mr. Kindrick's interest in CMI on the understanding that the financial representations made in the attachments to the SPS, and oral representations made by Mr. Kindrick about the state of CMI's relationship with RBC and other banks, were accurate.  (Doc. # 61, at 3-4.)  In particular, a document entitled "CMI Electronics, Inc., Balance Sheet," attached to the SPA, states that CMI had total liabilities and equity of $611,925.27, with a liability for sales tax payable of $467.26.  (Doc. # 61, Ex. 5, at 93.)  Upon purchase of CMI, the Third-Party Defendants allege, they learned that CMI in fact owed "close to $50,000" in sales tax, that there were significant other federal and state tax liabilities, and that the overall financial status of CMI had been overstated by approximately $600,000.  (Doc. # 61, Ex. 1, at 58, 85-87, 119 (deposition of Larry Branam).)  It is alleged that the poor financial condition in which the Third-Party Defendants found CMI led eventually to its bankruptcy.  (Doc. # 61, Ex. 1, at 206-07 (Branam deposition).)

### 1.  Fraudulent Suppression

Under Alabama law, a claim for fraudulent suppression, or fraud by silence, has four elements: "(1) a duty to disclose the facts, (2) concealment or nondisclosure of material facts by the defendant, (3) inducement of the plaintiff to act, and (4) action by the plaintiff to his injury."  *Bama Budweiser of Montgomery, Inc. v. Anheuser-Busch, Inc.*, 611 So. 2d 238, 245 (Ala. 1992).

12

Mr. Kindrick first argues that because he had no duty to disclose the relevant facts – that is, that the financial reports were inaccurate – the fraudulent suppression claim necessarily fails. He cites *Bama Budweiser*'s statement that "[s]ilence is not actionable unless there is a confidential relationship or some special circumstance that imposes a duty to disclose." *Id*. The existence of a duty "depends upon the fiduciary, or other, relationship of the parties, the value of the particular fact, the relative knowledge of the parties, and other circumstances of the case." *Id*. at 245-46; *see* Ala. Code § 6-5-102. If parties are dealing "with each other at arm's length, with no confidential relationship, no obligation to disclose arises when information is not requested." *Bama Budweiser*, 611 So. 2d at 246.

In *Bama Budweiser*, the nondisclosed information was an "adverse market report" that revealed that Anheuser-Busch was unhappy with the performance of the local beer distributorship that the plaintiff had purchased. *Id*. The plaintiff alleged that the seller of the distributorship had an obligation to reveal the report to him. The court noted that the plaintiff already had basic information, such as the report's cover letter, indicating the existence of a problem, but had failed to seek any additional information from either Anheuser-Busch or the seller. Under those circumstances, the court found that there was no "special relationship" between the parties, and hence no duty to disclose. *Id*.

Initially, it is important to establish what precisely the Third-Party Defendants claim Mr. Kindrick did wrong; their Complaint is not a model of clarity. If their claim is that the figures in the financial reports were inaccurate to the point of being fraudulent, the claim

13

would not be one for fraudulent suppression but for ordinary or innocent fraud. That appears to be part of the contention of paragraph 25 of the Third-Party Complaint. (Doc. # 19, ¶ 25.) Rather, in order to constitute a claim for fraudulent suppression, their argument seems to be that Mr. Kindrick had a duty to disclose that the numbers on the report were inaccurate, a somewhat confusing point at which to begin the analysis. (Doc. # 19, ¶¶ 22-25.)

With respect to the existence of a duty, it is that circumstance which makes this case distinguishable from *Bama Budweiser*. In that case, the plaintiff was aware that a report existed, had been written by a third party, and potentially contained negative information about the company it was purchasing, but the plaintiff made no particular effort to obtain it. Here, the Third-Party Defendants were actually given, as part of the contract of sale, financial statements purporting to accurately represent the financial state of CMI, of which Mr. Kindrick was the president and majority shareholder. Essentially, Mr. Kindrick argues that, despite authorizing the Third-Party Defendants to receive financial information about his own company, he had no duty to reveal to them any knowledge he had that the statements were inaccurate. In the language of *Bama Budweiser*, there are several bases for concluding that a special relationship may exist in circumstances such as these. For example, "the relative knowledge of the parties" put the Third-Party Defendants at a disadvantage, because the financial condition of CMI was in the unique purview of Mr. Kindrick and CMI itself. *See* 611 So. 2d at 246. Similarly, "the value of the particular fact" in this case would be very high, and the court finds that the "other circumstances" of this case also favor a finding that

14

a duty existed, given that, if true, Third-Party Defendants claims would reveal that Mr. Kindrick acted in bad faith.  *See id.*  On the other hand, there is nothing unusual here in the calculus of "relative knowledge" in the sale of one small business to another, in that the seller always has the knowledge "edge" with respect to that which he alone knows about the company.

Much of Mr. Kindrick's argument seems to conflate the factual question whether he actually knew the information in the SPA attachment was inaccurate with the legal question of the existence of a duty.  Having concluded that a duty may exist, the issue of knowledge is a question of fact for the jury.  Mr. Kindrick does briefly argue that the claim also fails because there is no evidence that he "possessed a present intent to deceive." (Doc. # 57, at 14.)  With respect to the suppression claim, this argument boils down to an assertion that the Third-Party Defendants lack "direct evidence" that Mr. Kindrick knew the records were wrong.  Mr. Kindrick, however, cites no authority for the proposition that "direct evidence" is required to prevail on a fraudulent suppression claim.  Under the circumstances of this case, a jury could find that Mr. Kindrick had knowledge of the records' inaccuracy based on the circumstances of the transaction and the representations made in the records, assuming the Third-Party Defendants can show those things at trial.  Moreover, the case cited by Mr. Kindrick to the effect that an specific "intent to deceive" is required concerned a fraudulent misrepresentation, rather than a fraudulent suppression, claim.  *Auto-Owners Ins. Co. v.*

15

*Abston*, 822 So. 2d 1187, 1197 (Ala. 2001); *Bama Budweiser*, 611 So. 2d at 244 (discussing the separate fraudulent misrepresentation claim in that case).

Finally, the court rejects Mr. Kindrick's contention that this claim should fail because the Third-Party Defendants did not rely reasonably on any misrepresentations because they waited too long after they bought the company to perform their own audits and other assessments. This issue may be relevant to the mitigation of damages, but would not affect the initial reliance involved in purchasing CMI.

On this claim, the motion for summary judgment is due to be denied.[4]

### 2. *Fraudulent Misrepresentation*

The fraudulent misrepresentation claim concerns Mr. Kindrick's alleged promises to the Third-Party Defendants about CMI's relationship with its bankers, and the likelihood that loans would be renewed. Larry Branam testified that Mr. Kindrick told him that there "were good relationships" with the bank and "there shouldn't be any problem renewing the notes." (Doc. # 61, Ex. 1, at 135 (Branam deposition).) Mr. Kindrick also allegedly told Mr. Branam that one of the banks had done business with Mr. Kindrick "for years" and that he "was friends" with a particular banker. (Doc. # 61, Ex. 7, at 8.) The Third-Party Defendants allege that Mr. Kindrick was aware that his relationships with the banks were deteriorating

---

[4] It is not entirely clear that a duty existed, as Third-Party Defendants repeatedly assert, nor that any particularly special circumstances existed between the parties. Moreover, the fraud claims, with respect to the financial condition of CMI at the time of the stock sale, are interwoven with contract issues flowing both ways. "Simply put, a plaintiff cannot convert the mere failure to perform or to fulfill a contractual promise to a fraud claim." *Dickinson v. Land Developers Constr. Co., Inc.,* 882 So. 2d 291, 303 (Ala. 2003). The better course is to proceed to trial for full factual development, with the synthesis of the pleadings, facts, and law to occur at that time.

16

and that the loans were unlikely to be renewed.  A claim for fraudulent misrepresentation has four elements: (1) a false representation; (2) of a material existing fact; (3) on which plaintiff reasonably relied; (4) that proximately caused injury or damage to the plaintiff.  *Auto-Owners*, 822 So. 2d at 1196.

Mr. Kindrick argues that his alleged statements did not concern material facts, and that, even if they did, the Third-Party Defendants could not reasonably have relied on them.  "[A] mere statement of opinion or prediction as to events to occur in the future is not a statement of a 'material fact' upon which individuals have the right to rely and, therefore, it will not support a fraud claim."  *McCutchen Co., Inc. v. Media Gen'l, Inc.*, 988 So. 2d 998, 1002 (Ala. 2008) (citation omitted).  The court agrees with Mr. Kindrick that this rule plainly bars a claim based only on the alleged prediction that "there shouldn't be any problem renewing the notes."  The Third-Party Defendants acknowledge this, but argue that a claim still survives given that the prediction was made in the context of Mr. Kindrick's representations about CMI's *presently* existing good relations with the banks.  But two inadequate representations do not combine to form an adequate one.  The assertion that a "relationship" is "good" borders on metaphysically vague.  For example, a "good relationship" with a bank might reasonably be taken to mean only that no loans were currently in default, rather than as a promise or prediction that future credit in any particular

17

amount would be extended.[5]   Thus, the court is skeptical that the "good relationship" statement was material.

Even assuming that it was, though, no jury could find that a businessperson would reasonably rely on such an assertion in making a major financial decision.  Unlike with respect to the fraudulent suppression claim, where Mr. Kindrick provided the Third-Party Defendants with specific financial information that was within the unique purview of CMI itself, CMI's "good relationship" with the banks could have been easily confirmed or disproven by contacting, with CMI's permission, the banks themselves.  If nothing else, Mr. Branam could at least have demanded more concrete details of Mr. Kindrick than the vague assurance he received.  As to the other statements – that Mr. Kindrick had been friends with one banker for a long time, and that the loans had existed for several years – the Third-Party Defendants do not even allege that they are false.

Because the oral statements allegedly made by Mr. Kindrick are not actionable as fraudulent misrepresentations, the motion for summary judgment on this count is due to be granted.

3.  *Breach of Contract*

While the Third-Party Complaint references both oral and written contracts, the breach of contract claim as discussed at the summary judgment stage appears to refer only to the

_____

[5] The SPA was signed January 8, 2008, but RBC did not demand payment on its outstanding loan until November 7, 2008, so there is no indication in the record what problems would have existed between CMI and its banks at the time of the sale.  (*See* Doc. # 49, Attach 1, Ex. C.)

SPA and attached financial information.  Third-Party Defendants cite the SPA's provision that "to the best of Seller's knowledge and belief, attach Exhibit 'A' [the financial statement] correctly reflected the Corporation's financial condition as of November 28, 2007."  (Doc. # 61, Ex. 5, at 85.)   For essentially the reasons given in the discussion of the fraudulent suppression motion, this claim will survive summary judgment.  Under the circumstances of this case, a jury could find that Mr. Kindrick had knowledge of the records' inaccuracy based on the circumstances of the transaction, the representations made in the records, and their inaccuracy.  If a jury found those things, it could reasonably conclude that the contractual provision in question had been breached.[6]  Therefore, summary judgment on this claim is due to be denied.

## IV.  CONCLUSION

For the foregoing reasons, it is ORDERED that Plaintiff RBC Bank's motion for summary judgment (Doc. # 47) is GRANTED, subject to additional briefing on the amount of attorneys' fees.  It is further ORDERED that Defendant Rondal Kindrick's motion for summary judgment (Doc. # 56) is GRANTED in part and DENIED in part.  It is GRANTED with respect to the fraudulent misrepresentation claim, and DENIED with respect to the fraudulent suppression and breach of contract claims.  It is further ORDERED that Mr. Kindrick's Rule 56(f) motion (Doc. # 58) is DENIED.  RBC is DIRECTED to provide the

---

[6] This is also the locus of the tension between the fraudulent suppression claim and the contract claim.

19

court, for *in camera* inspection, billing records and invoices sufficient to support its claimed attorneys' fees, within ten days of the date of this opinion.

     DONE this 8th day of July, 2010.


                                           /s/ W. Keith Watkins
                                       UNITED STATES DISTRICT JUDGE