IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| RONDAL J. KINDRICK, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CASE NO. 2:09-CV-169-WKW [WO] |
| | ) |
| CMI ELECTRONICS, INC., *et al.*, | ) |
| | ) |
| Defendants. | ) |

## **ORDER**

On November 17, 2011, a jury returned a verdict for $80,000 against Defendant Today's Design and Manufacturing, Inc. ("TDM") for breach of contract. After the trial, Plaintiff Ronald Kindrick orally moved the court to find that TDM is an instrumentality or alter ego of Defendant Larry Branam and to disregard the protections of the corporate form because TDM was undercapitalized, fraudulently operated, and operated as an alter ego of Mr. Branam. Mr. Kindrick has submitted a brief outlining his position. (Doc. # 212.) Defendants have responded. (Doc. # 214.) This motion has been fully briefed and is ready for resolution. For the reasons that follow, Mr. Kindrick's motion is due to be granted.

This action arose out of a Stock Purchase Agreement. On January 18, 2008, Mr. Kindrick sold his stock representing a controlling interest in CMI Electronics, Inc. ("CMI") to TDM, for $300,000 payable over ten years in monthly installments of

$2,500. Mr. Branam was the sole shareholder, officer and director of TDM throughout its existence from December 5, 2002. Following this sale and resultant transfer of corporate control to Mr. Branam, CMI became financially distressed, ultimately filing for bankruptcy. In this lawsuit, Mr. Kindrick sued Mr. Branam and the corporations he owned on numerous state law causes of action, and ultimately prevailed in securing a verdict against TDM for the unpaid installments of his Stock Purchase Agreement. Mr. Kindrick now seeks to have Mr. Branam, the sole owner and stockholder of TDM, held personally liable for the judgment against his company. This type of relief commonly is known as "piercing the corporate veil."

"[A] corporation is a distinct entity, to be considered separate and apart from the individuals who compose it." *Messick v. Moring*, 514 So. 2d 892, 894 (Ala. 1987). The corporate form and formalities are intended to protect individual shareholders from liability for corporate acts. *See Wright v. Alan Mills, Inc.*, 567 So. 2d 1318, 1319 (Ala. 1990). Nevertheless, the separateness of a corporation may be disregarded, even in the absence of fraud or illegality, to prevent injustice and inequitable consequences. *Id.* A claim to pierce the corporate veil is equitable in nature and tried to the court alone. *Ex parte Thorn*, 788 So. 2d 140, 144 (Ala. 2000). Piercing the corporate veil is not a power that is exercised lightly. *First Health, Inc. v. Blanton*, 585 So. 2d 1331, 1334 (Ala. 1991).

There are three theories recognized in Alabama law through which a court may pierce the veil of a corporation: (1) the corporation is inadequately capitalized; (2) the corporation is conceived or operated for a fraudulent purpose; or (3) the corporation is operated as an instrumentality or alter ego of an individual or entity with corporate control. *First Health,* 585 So. 2d at 1334 (citing *Messick*, 514 So. 2d at 894); *see also M & M Wholesale Florist, Inc. v. Emmons*, 600 So. 2d 998 (Ala. 1992).

Mr. Kindrick first argues that TDM was inadequately capitalized. TDM's financial statements contained in its 2007 and 2008 U.S. tax returns indicate that there was zero paid-in capital and no other capital investments. (Pl.'s Trial Exs. 43 and 44.) Additionally, Mr. Branam testified that the only money that TDM ever had was deposited in TDM's account from checks drawn on his personal account. These $2,500 deposits were made by Mr. Branam to TDM so that TDM could make its monthly installment payments to Mr. Kindrick under the Stock Purchase Agreement. Mr. Branam's contributions totaled $32,500. Mr. Kindrick argues that this pay-as-you-go capital structure left TDM with finances that were so weak from its inception that TDM could never satisfy even one installment payment without a deposit from Mr. Branam's personal account. Furthermore, Mr. Kindrick argues that he did not have the opportunity to investigate the capital structure of TDM prior to the

execution of the Stock Purchase Agreement on January 18, 2008, so the inadequacies of TDM's capitalization should not be held against him.

Defendants respond that TDM never missed a single payment until it suspended payments when it considered the contract breached and, therefore, was always sufficiently capitalized to fund its obligations. Defendants also attack the adequacy of Mr. Kindrick's investigation of TDM's finances. However, any lack of diligence in Mr. Kindrick's investigation is largely a side show. Mr. Kindrick's failure to investigate and protect himself fully from the consequences of doing business with Mr. Branam and TDM does not overcome the relevancy of TDM's financing, which is the focus of the inquiry.

Ordinarily, the fact that a corporation is undercapitalized alone does not defeat the corporate existence. *See Shelton v. Clements*, 834 So. 2d 775, 781 (Ala. Civ. App. 2002). However, in conjunction with other factors, including a design to use the corporate form to evade personal liability, the corporate form may be reduced to a mere instrumentality. *See id.* at 782. The fact that TDM was not self sustaining (indeed, it apparently had no other business operation besides servicing this single monthly installment note to Mr. Kindrick, and no income at all) and required constant personal capital infusions from Mr. Branam to pay each installment of the purchase agreement, cuts in favor of piercing the corporate veil. While this ground alone is not

sufficiently convincing to demonstrate that TDM's corporate structure should be disregarded, it weighs in favor of Mr. Kindrick's position.

Mr. Kindrick next argues that TDM was conceived with a fraudulent purpose or operated fraudulently.[1]  *See Messick*, 514 So. 2d at 894.  A corporation's fraudulent operations may be evident

> where the legal requirements of corporate law are not complied with, where the corporation maintains no corporate records, where the corporation maintains no corporate bank account, where the corporation has no employees, where corporate and personal funds are intermingled and corporate funds are used for personal purposes, or where an individual drains funds from the corporation.

*Simmons v. Clark Equip. Credit Corp.*, 554 So. 2d 398, 401 (Ala. 1998).

TDM's evidence of corporate existence and transactions is a decidedly mixed bag.[2]  On the one hand, corporate formalities were generally followed and documented.  All minutes of the annual meetings of the sole shareholder and director, Mr. Branam, are present and accounted for.  There is one record of a special meeting of the director, on September 22, 2003, for the purpose of allowing TDM to transact business in New Mexico, Oklahoma, and Washington.  There is one instance of the

---

[1] There is no evidence the corporation was conceived for a fraudulent purpose in 2002, long before Mr. Kindrick and CMI came into the picture.  The focus here is on its operation.

[2] TDM's records and bookkeeping are spotty.  TDM proffered bylaws, corporate minutes, tax documents, and government registration documents as evidence of following corporate formalities.  Some of these documents were already offered into evidence at the trial.

registered agent being changed, dated October 16, 2008, according to an unsigned copy of a Texas Secretary of State form. A 941 tax return was filed for 2003 but not thereafter, apparently due to the corporation having no employees. That is generally the one hand.

The other hand is not fallow, however. Absent are any TDM minutes authorizing, approving, or even mentioning the transaction with Mr. Kindrick and CMI. There is simply no corporate record. Moreover, records confirm Mr. Kindrick's arguments concerning TDM's lack of capitalization. Annual federal tax returns were filed, notable for containing nothing but zeros on all lines calling for numbers.[3] The tax returns also failed to account for the ownership of CMI. TDM's 2007 and 2008 tax returns, admitted into evidence and argued extensively by Plaintiff's counsel, show that none of the "capital contributions" made by Mr. Branam was reflected on TDM's books as capital investments, or otherwise accounted for in the tax returns. Nothing in the corporate records reflects any capital investment actually reaching the corporation's coffers. This is important because Mr. Branam deposited enough, just

---

[3] Defendants argue that the tax returns do not reflect any of this information because TDM was not required to complete certain schedules, such as schedules L and M-1, if the corporation's total receipts were less than $250,000. (Doc. # 214 at 8.) However, the tax returns do more than omit information that was not required by the Internal Revenue Service. The tax returns affirmatively state "$0" throughout for liabilities, income, debts, and contributions. (Pl.'s Trial Ex. 44.)

enough, into TDM's bank account to make installment payments to Mr. Kindrick until CMI failed. In short, the absence of authorization for the transaction at issue or meaningful evidence of adequate capitalization leaves TDM open to the charge of fraudulent operation *vis-a-vis* this transaction. As will be discussed, it also implicates the alter ego theory.

Witnesses also testified that projects, employees, and business relationships were routinely transferred from CMI to DisCorp, a separate company owned and operated by Mr. Branam. Even when much weight is given to Mr. Adamson's testimony that DisCorp was not simply taking money for jobs performed by CMI, and Mr. Ferguson's testimony is discounted, there was still substantial evidence that CMI's projects and resources were often transferred over or performed by DisCorp at cost, realizing no profit for CMI or TDM, and that CMI employees were working DisCorp projects. The degree of trouble that CMI was in at the time of the stock sale was hotly contested at trial. Defendants argue that CMI's lost business opportunities and lines of credit were the proximate causes of its failure and the shift of work to DisCorp. However, CMI's indebtedness crisis that led to CMI's credit being cut off occurred under TDM's watch, and gradually resulted in the shifting of jobs and employees to DisCorp while CMI lost opportunities and disintegrated. Essentially,

the only opportunities for CMI to become solvent and be saved were taken instead by DisCorp, deepened the hole CMI and TDM were in, and left CMI to fail.

Mr. Kindrick argues that the court should infer that Mr. Branam's scheme was to purchase Mr. Kindrick's stock with a shell corporation, and give that shell corporation only enough intermittent "capital" to allow it to pay Mr. Kindrick's installment payments while he transitioned CMI's resources over to DisCorp. Even if no nefarious purpose on the part of Mr. Branam is assumed, the evidence supports that CMI's business and assets were being syphoned off and mismanaged when CMI ran into trouble, while DisCorp was being strengthened by CMI's employees and resources. Even if it is further assumed that this was a case of two businesses failing and an effort being made to save one, CMI and TDM were allowed to plummet into debt and fail while DisCorp was saved, and the only opportunities for CMI to escape its dire situation went instead to DisCorp, which arguably would not have been the likely result from independent management of CMI and TDM.

Mr. Kindrick has the better argument here. The misleading records and transfer of projects and assets more closely resemble subterfuge than the normal workings of a corporate entity. This ground alone is likely sufficient to show that TDM's corporate structure should be disregarded, but it will be considered in connection with the capitalization and alter ego theories.

The third theory by which a trial court may pierce the corporate veil is when the corporation is operated as the alter ego of another. *See First Health*, 585 So. 2d at 1334. This finding requires a demonstration that the corporate entity should be disregarded because of the excessively dominant control of the owner over the corporate structure. The required elements are that the owner must have complete control and domination of the subservient corporation's finances, policies and business practices, effectively depriving the subservient corporation of separate mind, will, or existence of its own; that the control must have been misused by the dominant party; and that the misuse must have caused harm to the plaintiff. *Id.* Mr. Kindrick alleges that Mr. Branam owns 100% of the outstanding stock in TDM, made all of TDM's capital contributions, and misused control by undercapitalizing TDM in order to prevent Mr. Kindrick from collecting his debt. Mr. Kindrick further alleges that TDM mismanaged CMI in order to benefit DisCorp, and that the inability to bill DisCorp for projects or labor above cost prevented TDM from ever obtaining a profit, which would be necessary for TDM to independently fund the distributions to Mr. Kindrick.

Essentially, Mr. Kindrick argues that the harm he suffered is that CMI was plundered, and the arrangement was designed to fail by TDM's being unable to generate the level of revenue needed to fund the installment payments under the Stock

Purchase Agreement.  Mr. Kindrick's theory of harm was not just that the payments stopped once a dispute arose between him and Mr. Branam, but that the contract was breached prospectively by Mr. Branam, enabled by his absolute control of TDM and destruction of the means for long term financing of the payments.  In light of the jury verdict, and of the structuring of TDM and the course of conduct, Mr. Kindrick has offered the more compelling argument on this ground.

The court concludes, based on a combination of the previously discussed factors and the totality of the circumstances, that Mr. Branam operated TDM as a mere instrumentality or alter ego of himself, that TDM was so thinly capitalized that it could not survive absent Mr. Branam's direct intervention, and that TDM was operated for a fraudulent purpose to avoid liability for payments to Mr. Kindrick. Therefore, Mr. Branam should be held personally liable for the payments under the Stock Purchase Agreement between Mr. Kindrick and TDM.

It is therefore ORDERED that Plaintiff's oral Motion to Pierce the Corporate Veil is GRANTED, and that Larry Branam is personally liable for the judgment against Today's Design and Manufacturing, Inc.

DONE this 21st day of September, 2012.

                                                  /s/ W. Keith Watkins
                                   CHIEF UNITED STATES DISTRICT JUDGE